STATE OF MAINE                    UNIFIED CRIMINAL DOCKET

Cumberland, ss.
                        STATE OF MAINE
                 Cumberland, ss, Clerk's Office

STATE OF MAINE            SEP 07 2017

v.                       **RECEIVED** Docket No. CUMCD-CR-17-1204

RUDY ANTENOR

**Defendant**

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

Defendant Rudy Antenor has filed a Motion to Suppress Results of Search and Any and All Fruits From search, seeking to exclude evidence and statements obtained by the State as the result of the March 2, 2017 traffic stop and search of the vehicle in which he was riding. Hearing on the motion commenced June 8, 2017, with Shamira Thomas as the sole witness. It continued on June 19, 2017, with the testimony of Jesse Duda, the Maine state trooper who conducted the stop and the search.

State's Exhibits 1, 2, 3 and 4 were all admitted into evidence for purposes of the Defendant's Motion. State's Ex. 1 consists of a video recording taken from the dashboard and interior cameras of Tr. Duda's cruiser before and during the stop and search. State's Ex. 2 is a recording of the search taken from the cruiser operated by Tr. Duda's patrol supervisor, Sgt. Thomas Pappas. State's Ex. 3 and 4 are documents relating to Tr. Duda's training and qualifications as a K-9 handler, and

relating to the training and qualifications of the K-9 Mack, the narcotic detector dog assigned to Tr. Duda.

After the close of the hearing, the parties submitted memoranda on the issues, the last of which was filed August 15, 2017. Defendant's memorandum is titled Supplemental Motion to Suppress, and it presents further legal argument in support of his position.

Based on the entire record, the court adopts the following findings of fact and conclusions of law for purposes of the Motion to Suppress.

### Findings Of Fact

A. *The Stop of the Motor Vehicle*

Around 11 p.m. Thursday, March 2, 2017, Defendant Rudy Antenor was riding as a passenger in a vehicle operated by his friend, Shamira Thomas. (The vehicle is hereafter referred to as "the Thomas vehicle.") Ms. Thomas had rented the vehicle, a Jeep sport utility vehicle with out-of-state license plates, from a commercial vehicle rental company a few days before. The Defendant had no ownership interest, leasehold interest, or other right, title or interest in the vehicle.

The vehicle was traveling north at about the posted speed limit of 70 miles per hour in the middle of the three northbound lanes of the Maine Turnpike in Scarborough when Trooper Jesse Duda of the Maine State Police approached it from behind in his marked Maine State Police cruiser.

The Maine Turnpike is a limited-access way with a speed limit of 65 or more miles per hour for purposes of the motor vehicle law that requires vehicles traveling

2

on such a way to drive in the right-hand lane except when overtaking and passing other vehicles. *See* 29-A M.R.S. § 2052(6) ("An operator driving on a limited-access way with a speed limit of 65 or more miles per hour is restricted in ordinary operation to the right-hand lane and may use adjacent lanes for overtaking and passing another vehicle, but must return to the right-hand lane at the earliest opportunity.")

Tr. Duda was on duty, in uniform and engaged in routine patrol. The cruiser he was driving is equipped with a forward-facing and backward-facing camera unit that can record video of both the area ahead and the cruiser interior. He has been trained and certified as a detector K-9 handler. The other member of his Detector K-9 team, the K-9 Mack, was in the back seat of the cruiser. Mack is a trained and certified narcotic detector dog. See State's Exs. 3, 4. The certificate for the Duda-Mack Detector K-9 team dates to October 2016, five months before the stop at issue.

Traveling in the middle lane behind and somewhat faster than the Thomas vehicle, Tr. Duda's cruiser gradually caught up to the Thomas vehicle over a period of about two minutes and a distance of more than two miles. Throughout that interval, the Thomas vehicle remained in the middle of the three lanes, with no cars visible in the right lane.

Tr. Duda's cruiser video (State's Ex. 1) depicts only the second of the two minutes during which Tr. Duda's cruiser followed the Thomas vehicle before the stop—the video thus shows the Thomas vehicle traveling ahead of the cruiser for about a mile. The approximately one minute of video before the stop is initiated

3

does not show any vehicles in the right-hand lane. The only other northbound vehicle shown on the video during the minute before the stop is a vehicle in the middle lane ahead of the Thomas vehicle.

Because there were no vehicles in the right-hand lane, the Thomas vehicle was not passing any vehicles and could have moved over to the right-hand lane at any time during the entire one-mile distance shown on the one minute of video before Tr. Duda activated the blue wig-wag lights on his cruiser.

Based on his observation of the Thomas vehicle's failure to move to the right-hand lane despite ample opportunity to do so, Tr. Duda decided that the vehicle was violating 29-A M.R.S. § 2052(6), the motor vehicle law requiring vehicles to travel in the right-hand lane of a limited-access way with a speed limit of 65 miles per hour or more, except when passing other vehicles. Tr. Duda activated his cruiser's blue lights. The Thomas vehicle moved from the middle lane to the right lane and then onto the paved shoulder, with the cruiser pulling in behind it.

As the video shows the Thomas vehicle rolling to a stop in front of the cruiser, the video also shows another northbound vehicle passing by. It is this vehicle that Defendant claims prevented the Thomas vehicle from moving safely to the right lane. However, during the two minutes during which the cruiser was catching up to the Thomas vehicle, this vehicle that later passed by could only have been well behind the cruiser (and thus even farther behind the Thomas vehicle). Thus, the vehicle that the video shows passing by as the Thomas vehicle was coming

4

to a stop could not possibly have prevented the Thomas vehicle from moving safely to the right lane.

B. *The Investigation and Search*

The Thomas vehicle had come to a stop very close to the fog line, meaning that Tr. Duda would have to stand in the Turnpike travel lane to speak to the driver. He went instead to the passenger side window. He saw Defendant in the front passenger seat and saw Ms. Thomas in the driver's seat. He could smell the odor of burnt marijuana coming from inside the vehicle, and suspected that the driver of the vehicle might be impaired and that there might be marijuana or other drugs inside the vehicle. Ms. Thomas and the Defendant both denied smoking marijuana in the vehicle, although Ms. Thomas later acknowledged having smoked marijuana earlier in the evening.

At Tr. Duda's request, Ms. Thomas produced her driver's license, issued by Massachusetts. Defendant identified himself by first name only. Tr. Duda asked Ms. Thomas to step outside the car, indicating he wished to verify her license and determine whether she was impaired by any intoxicant. In response to questions from the trooper, Ms. Thomas indicated that she and the Defendant were on their way to Lewiston to see friends, whom she identified by first name only. She said she was too tired to drive the rest of the way and she and Defendant were staying in a motel, the name of which she could not recall but which she identified as being in Lewiston. She said she did not have a paper copy of the rental car agreement.

Tr. Duda returned to the passenger side of the Thomas vehicle, at which point the Defendant identified himself by his full name and date of birth. He said nothing at that point about being a probationer. When he asked Defendant to look for the car rental agreement, the trooper noted that the Defendant looked around him but did not open the glove compartment in front of him—a place the trooper reasonably believed would be an obvious place to look. In response to a question from the trooper, Defendant said he and Ms. Thomas were going to a casino for a couple of days.

Tr. Duda returned to the cruiser, where Ms. Thomas was still waiting, and after running a check on Defendant, learned that Defendant was on federal probation.

Upon his return to the Thomas vehicle, Defendant confirmed he was on federal probation for what he said was a weapons offense, and offered that his probation officer did not know he had come to Maine and that he was not supposed to be in Maine. He then gave the trooper a different account than the one he had given minutes before about why he had come to Maine.

Tr. Duda then returned to his vehicle and learned from the dispatcher that Defendant was in fact on probation for a drug offense. At that point, Ms. Thomas, who was in the cruiser and out of the cold weather at that point, said that Defendant might have "a little" marijuana on his person.

At this point, about 25 minutes had passed after Tr. Duda had initiated the stop. Based on all that he had observed, Tr. Duda reasonably suspected that there

6

were illegal drugs or evidence regarding the use of illegal drugs within the vehicle. The circumstances that led him to that suspicion included:

- the odor of marijuana in the vehicle;

- Ms. Thomas's admission that she had smoked marijuana and her statement that Defendant might have some marijuana on his person;

- Defendant's seeming reluctance to open the glove compartment of the Thomas vehicle;

- Defendant's false statement about being on probation for a weapons offense rather than for a drug offense;

- Defendant's admission that he was in violation of his probation conditions;

- the contradictory accounts given by Ms. Thomas and the Defendant about their plans.

Tr. Duda decided to use the K-9 Mack to do a drug search of the outside of the Thomas vehicle, but also decided, in the interest of his own and Mack's safety, to call a second officer to the scene for back-up. The back-up officer, Sgt. Thomas Pappas of the State Police arrived very soon after being asked to come to the scene of the stop.

Tr. Duda told Defendant that he had a trained drug dog and asked if the Defendant thought the dog would detect cocaine or opiates. The Defendant said, No. The officer then asked if Defendant would consent to a search of himself and the inside of vehicle, and the Defendant consented. Defendant's words are not audible

7

on the video, but from the trooper's affirmative response, the court infers that the Defendant consented.

Tr. Duda asked Defendant to step out of the vehicle and did a pat-down of Defendant for his own safety, finding no weapons. Tr. Duda then brought the K-9 Mack to the vehicle. Without being prompted to do so, Mack moved to the open passenger side door and spontaneously jumped onto the passenger seat. After being taken outside the vehicle, Mack sat down next to the open front passenger door. Based on his and Mack's training and experience, Tr. Duda interpreted Mack's actions as indicating that Mack had detected drugs of the kind he had been trained to detect inside the Thomas vehicle, specifically around the air vents on the dashboard on the passenger side and the front passenger seat.

Tr. Duda then asked Ms. Thomas and the Defendant to stand while Mack sniffed each of them. Mack "indicated", meaning showed that he had detected some type of drug, on Defendant's right ankle.

About 58 minutes after the stop was initiated, Defendant was placed under arrest and transported to the Cumberland County Jail. A search of the Thomas vehicle revealed about 30 grams of a substance later identified as crack cocaine concealed behind the glove compartment in front of the front passenger seat. A search of Defendant at the Jail revealed a smaller quantity of cocaine concealed in the hem of his right trouser leg.

8

**Analysis**

1. *The Validity of the Stop*

Under the United States and Maine Constitutions, to justify a traffic stop of a motor vehicle by a police officer, the State must prove that the police officer had "an objectively reasonable, articulable suspicion that either criminal conduct, a civil violation, or a threat to public safety has occurred, is occurring, or is about to occur." *State v. Sasso*, 2016 ME 95, ¶ 12, 143 A.3d 124, *quoting State v. Sylvain*, 2003 ME 5, ¶ 11, 814 A.2d 984 (footnote omitted).

The State has proved both that Tr. Duda initiated the stop based on his actual suspicion of a section 2052(6) civil violation and that his suspicion was objectively reasonable, based on his observation of the Thomas vehicle continuing to travel in the middle lane for up to two miles despite the fact that it was not passing or overtaking any vehicle.

Defendant raises several arguments against the validity of the stop.

First, he argues that the stop was pretextual—specifically, that the real reason for the stop was that the Maine State Police are on the lookout for out-of-state vehicles traveling up the Maine Turnpike for purposes of illegal drug activity. However, "the subjective motivation of the officer is not relevant on the ultimate determination of a reasonable, articulable suspicion, which requires an objective analysis." *State v. Sasso, supra*, 2016 ME 95 at ¶ 14, 143 A.3d 124.[1] Tr. Duda in fact

---

[1] The court in *Sasso* noted that the issue of pretext or subjective motivation "may bear on credibility of witnesses, context, or reliability of the evidence presented." 2016 ME 95, ¶ 16,

believed that he was witnessing a section 2052(6) violation by the Thomas vehicle; whether he had any further subjective motivation for the stop is irrelevant.

Defendant also argues that Tr. Duda's suspicion of a section 2052(6) violation was not objectively reasonable.

One basis for this argument is Ms. Thomas's testimony that Tr. Duda's cruiser was coming up so quickly from behind that she did not believe she could safely change lanes. However, as noted above, the cruiser followed her for two minutes or more than two miles. Even the one minute that is captured on video shows the Thomas vehicle quite far ahead of the cruiser, with no cars visible in the right-hand lane. The video also shows the gap between the cruiser and the Thomas vehicle closing relatively slowly, negating Ms. Thomas's claim that the cruiser came up so quickly she had no time to move safely to the right. The video conclusively shows that Ms. Thomas had ample opportunity to move her vehicle safely to the right-hand lane.

Defendant also points to the fact that, as the cruiser and the Thomas vehicle are pulling off the road, the video shows a northbound vehicle passing by. Defendant claims that this vehicle prevented Ms. Thomas from moving into the right lane. The basis for that claim is hard to fathom, because this vehicle can only have been well behind Tr. Duda's cruiser and therefore even further behind the Thomas vehicle, throughout the two minutes that Tr. Duda's cruiser was gradually

143 A.3d 124. Tr. Duda's testimony was credible, and all affirmative findings made in this Order are based on what the court deems reliable evidence.

10

catching up to the Thomas vehicle. This vehicle could not possibly have prevented the Thomas vehicle from safely moving into the right-hand lane. Moreover, once the blue lights went on, the Thomas vehicle was able, in fact, to move safely into the right-hand lane and then onto the breakdown lane, before the vehicle went by.

For all of the foregoing reasons, the court finds and concludes that the State has met its burden to show that Tr. Duda's stop of the Thomas vehicle was based on his objectively reasonable, articulable suspicion of a civil motor vehicle violation.

2. *The Validity of the Search of Defendant and the Vehicle*

Defendant raises a variety of objections to the search of his person and of the vehicle, primarily that the stop was unreasonably and thus unlawfully prolonged as a result of the search for drugs, but also that the search of the vehicle and his person was illegal.

His argument that the stop was unreasonably long relies substantially on the United States Supreme Court decision in *Rodriguez v. United States*, ___ U.S. ___, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015). In *Rodriguez*, the Court invalidated the fruit of a "dog sniff" search by a drug dog on the ground that the drug search unreasonably prolonged the duration of the search. 135 S. Ct. at 1616-17.

Citing its prior decision in *Illinois v. Caballes*, the court noted that a "dog sniff" drug search outside a vehicle is permissible in the context of an ordinary traffic stop, even in the absence of a reasonable suspicion of drug-related criminal activity, as long as the search does not prolong the stop beyond the time reasonably required for

11

an ordinary traffic stop. 135 S. Ct. at 1614-15, *citing Illinois v. Caballes*, 543 U. S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005).

However, in *Rodriguez*, the court noted that a traffic stop can be prolonged by a drug search beyond what usually would be required for an ordinary traffic stop, if the drug search is based on reasonable suspicion of drug-related activity. The Court said, "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop [but] may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." 135 S. Ct. at 1615.

Here, within less than a half hour of initiating the traffic stop, Tr. Duda developed a reasonable suspicion of drug-related activity associated with the Thomas vehicle and decided to do a "dog sniff" drug search with Mack. At that point, what began as an ordinary traffic stop became a criminal investigation that justified a more prolonged detention of Defendant than might be justified in an ordinary traffic stop. In addition, the stop was prolonged by Tr. Duda's effort to contact Defendant's probation officer, based on Defendant's acknowledgment that he was not supposed to be in Maine and his probation officer did not know where he was. The court concludes that the State has met its burden to prove that the length of Defendant's detention before his arrest was reasonable.

Defendant also objects to the search of the vehicle, but as the findings above reflect, the evidence affirmatively establishes that he consented to the search. Even had Defendant not consented, as a passenger in a vehicle in which he had no right,

title or interest whatever, he lacks standing to object to a search of the vehicle. *See State v. Lovett*, 2015 ME 7, ¶8, 109 A.3d 1135, *citing Rakas v. Illinois*, 439 U.S. 128, 148, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978); *State v. Littlefield*, 161 Me. 415, 420-21 (1965).

The two searches of Defendant himself—the pat-down conducted by Tr. Duda and the later "dog sniff" drug search, were both justified—the pat-down for weapons was justified in terms of officer safety and the "dog sniff" drug search was justified by the reasonable suspicion of illegal drugs, which by that point had been confirmed by Mack's alerts in the front passenger seat area where Defendant had been sitting.

Based on the foregoing findings and conclusions, it is hereby ORDERED: Defendant's Motion to Suppress, as supplemented by Defendant's Supplemental Motion to Suppress, is hereby denied.

Dated September 4, 2017

A. M. Horton, Justice

13

CRIMINAL DOCKET
CUMBERLAND, ss.
Docket No    CUMCD-CR-2017-01204

**DOCKET RECORD**

DOB: 04/24/1986

Attorney:    ROGER BRUNELLE          State's Attorney:    STEPHANIE ANDERSON
LAW OFFICES OF ROGER F BRUNELLE
75 PEARL ST 2ND FLOOR
PORTLAND ME 04101
APPOINTED 03/06/2017

Filing Document:    CRIMINAL COMPLAINT          Major Case Type:  FELONY (CLASS A,B,C)
Filing Date:          03/06/2017

**Charge(s)**

1   AGGRAVATED TRAFFICKING OF SCHEDULED DRUGS          03/02/2017     SCARBOROUGH
Seq 8555          17-A   1105-A(1)(B)(1)          Class A

2   UNLAWFUL TRAFFICKING IN SCHEDULED DRUGS          03/02/2017     SCARBOROUGH
Seq 8541          17-A   1103(1-A)(A)          Class B

3   TRAFFICKING IN PRISON CONTRABAND          03/02/2017     SCARBOROUGH
Seq 4535          17-A   757(1)(B)          Class C

**Docket Events:**

03/06/2017  FILING DOCUMENT - CRIMINAL COMPLAINT FILED ON 03/06/2017

03/06/2017  Charge(s):  1,2,3
HEARING -  INITIAL APPEARANCE SCHEDULED FOR 03/06/2017 at 01:00 p.m. in Room No.  1

NOTICE TO PARTIES/COUNSEL
03/07/2017  Charge(s):  1,2,3
HEARING -  INITIAL APPEARANCE HELD ON 03/06/2017
THOMAS D WARREN , JUSTICE
DA: JULIA SHERIDAN
Defendant Present in Court
                                        FTR 1
03/07/2017  Charge(s):  1,2,3
PLEA -  NO ANSWER ENTERED BY DEFENDANT ON 03/06/2017

03/07/2017  BAIL BOND -  CASH BAIL BOND SET BY COURT ON 03/06/2017
THOMAS D WARREN , JUSTICE
$20,000. W/ CONDS.
03/07/2017  HEARING -  DISPOSITIONAL CONFERENCE SCHEDULED FOR 05/16/2017 at 08:30 a.m. in Room No.  7

03/07/2017  TRIAL -  JURY TRIAL SCHEDULED FOR 07/24/2017 at 08:30 a.m. in Room No.  11

NOTICE TO PARTIES/COUNSEL
03/07/2017  MOTION - MOTION FOR APPOINTMENT OF CNSL FILED BY DEFENDANT ON 03/06/2017

03/07/2017  MOTION - MOTION FOR APPOINTMENT OF CNSL GRANTED ON 03/06/2017
THOMAS D WARREN , JUSTICE
COPY TO PARTIES/COUNSEL
03/07/2017  Party(s):    RUDY ANTENOR
ATTORNEY - APPOINTED ORDERED ON 03/06/2017

Attorney: ROGER BRUNELLE
04/14/2017 Charge(s): 1,2,3
SUPPLEMENTAL FILING - INDICTMENT FILED ON 04/07/2017

04/14/2017 Charge(s): 1,2,3
HEARING - ARRAIGNMENT SCHEDULED FOR 05/16/2017 in Room No. 7

05/16/2017 HEARING - DISPOSITIONAL CONFERENCE HELD ON 05/16/2017
MARY KELLY , DISTRICT COURT CHIEF JUDGE
Attorney: ROGER BRUNELLE
DA: CARLOS DIAZ
CONF HELD. OFFER OFFER MADE. MOTION TO SUPPRESS TO BE FILED. FILING DEADLINE EXTENDED TO 5/22/17
05/24/2017 Charge(s): 1,2,3
HEARING - ARRAIGNMENT CONTINUED ON 05/16/2017

05/24/2017 MOTION - MOTION TO SUPPRESS FILED BY DEFENDANT ON 05/22/2017

05/24/2017 HEARING - MOTION TO SUPPRESS SCHEDULED FOR 06/08/2017 at 01:00 p.m. in Room No. 1

NOTICE TO PARTIES/COUNSEL
05/24/2017 HEARING - MOTION TO SUPPRESS NOTICE SENT ON 05/24/2017

05/25/2017 Charge(s): 1,2,3
HEARING - ARRAIGNMENT SCHEDULED FOR 06/08/2017 at 01:00 p.m. in Room No. 1

06/08/2017 CASE STATUS - CASE FILE LOCATION ON 06/08/2017

CASE IS WITH JUSTICE HORTON
06/08/2017 HEARING - MOTION TO SUPPRESS SCHEDULED FOR 06/19/2017 at 01:00 p.m.
ANDREW HORTON , JUSTICE
NOTICE TO PARTIES/COUNSEL
06/08/2017 HEARING - MOTION TO SUPPRESS NOTICE SENT ON 06/08/2017

06/20/2017 HEARING - MOTION TO SUPPRESS HELD ON 06/19/2017
ANDREW HORTON , JUSTICE
Attorney: ROGER BRUNELLE
DA: CARLOS DIAZ
FTR 8                                              DAY 2 OF HEARING. SCHEDULE ANOTHER 2HR(DAY 3)
06/20/2017 CASE STATUS - CASE FILE RETURNED ON 06/19/2017

06/20/2017 HEARING - MOTION TO SUPPRESS HELD ON 06/08/2017
ANDREW HORTON , JUSTICE
Attorney: ROGER BRUNELLE
DA: CARLOS DIAZ
FTR 8                                              DAY 1, SCHEDULE ANOTHER DAY TO FINISH
07/12/2017 OTHER FILING - OTHER DOCUMENT FILED ON 06/29/2017

PER EMAIL OF THE PARTIES: DO NOT NEED TO PRESENT FURTHER EVIDENCE ON DEFENDANTS MOTION TO
SUPPRESS. DEFENDANT TO SUBMIT MEMORANDUM BY 7/21/17. STATE TO RESPOND BY 8/4/17. JUSTICE
HORTON HAS AGREED TO THIS SCHEDULE.
07/12/2017 TRIAL - JURY TRIAL NOT HELD ON 07/12/2017

MOTION TO SUPPRESS STILL PENDING.
07/12/2017 TRIAL - JURY TRIAL SCHEDULED FOR 08/28/2017 at 08:30 a.m. in Room No. 11

NOTICE TO PARTIES/COUNSEL
07/12/2017 TRIAL - JURY TRIAL NOTICE SENT ON 07/12/2017

07/17/2017 NOTE - OTHER CASE NOTE ENTERED ON 07/17/2017

JIM PAUL TURCOTTE , ASSISTANT CLERK
EMAIL FROM PARTIES SEEKING TO MOVE DEADLINES; ACCEPTABLE PER JUSTICE HORTON. DEFENSE BRIEF IS
NOW DUE 7/25, OPPOSITION 8/7, DEFENSE REPLY 8/11.
07/26/2017 MOTION - MOTION TO SUPPRESS FILED BY DEFENDANT ON 07/25/2017

SUPPLEMENTAL MOTION TO SUPPRESS RESULTS OF SEARCH AND ANY AND ALL FRUITS FROM SEARCH
08/07/2017 OTHER FILING - MEMORANDUM OF LAW FILED ON 08/07/2017

DA: CARLOS DIAZ
08/17/2017 OTHER FILING - OTHER DOCUMENT FILED ON 08/15/2017

Attorney: ROGER BRUNELLE
REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS RESULTS OF SEARCH AND
ANY AND ALL FRUITS FROM SEARCH
08/24/2017 TRIAL - JURY TRIAL CONTINUED ON 08/24/2017

MOTION UNDER ADVISEMENT
08/24/2017 Charge(s): 1,2,3
TRIAL - JURY TRIAL SCHEDULED FOR 09/11/2017 at 08:30 a.m. in Room No. 11

NOTICE TO PARTIES/COUNSEL
08/24/2017 Charge(s): 1,2,3
TRIAL - JURY TRIAL NOTICE SENT ON 08/24/2017

JIM PAUL TURCOTTE , ASSISTANT CLERK
09/07/2017 Charge(s): 1,2,3
HEARING - ARRAIGNMENT NOT HELD ON 06/08/2017

09/07/2017 Charge(s): 1,2,3
HEARING - ARRAIGNMENT SCHEDULED FOR 09/11/2017 at 08:30 a.m. in Room No. 11

09/07/2017 MOTION - MOTION TO SUPPRESS DENIED ON 09/07/2017
ANDREW HORTON , JUSTICE
COPY TO PARTIES/COUNSEL
09/07/2017 MOTION - MOTION TO SUPPRESS DENIED ON 09/07/2017
ANDREW HORTON , JUSTICE
COPY TO PARTIES/COUNSEL

A TRUE COPY
ATTEST: _____
          Clerk